# UNITED STATES DISTRICT COURT
for the
Western District of Virginia

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

FEB 12 2016

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Michael LINTZ's office and work space at Norton Parks and Recreation Maintenance Division, 1324 Water Plant Road, Norton, VA

Case No. 2:16mj00005

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

see Attachment A

located in the _____Western_____ District of _____Virginia_____, there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 242 | Deprivation of rights under color of law |
| 18 USC 1001 | False statements |

The application is based on these facts:

see attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ryan Temm, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___02/12/2016___

_____
*Judge's signature*

City and state: Abingdon, VA

Pamela Meade Sargent, USMJ
*Printed name and title*

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED
FEB 12 2016
JULIA␣␣DUDLEY CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

IN THE MATTER OF THE SEARCH OF              )
                                            )
CITY OF NORTON PARKS & RECREATION           )
DEPARTMENT, OFFICE AND WORK SPACE           )   CASE NO. 2:16mj00005
OF MAINTENANCE SUPERVISOR                   )
MICHAEL LINTZ, LOCATED AT                   )
1324 WATER PLANT ROAD, NORTON, VA           )
                                            )

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT

Your affiant, Ryan C. Temm, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), assigned to the Bristol, Virginia Field Office, having been duly sworn, deposes and states as follows:

### INTRODUCTION

1.      I am an investigative law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 United States Code, and am empowered by law to conduct investigations and to make arrests for the offenses enumerated in Section 2516 of Title 18 United States Code.

2.      I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and have been employed for approximately seven and half years (7.5) years. I received my training with the Federal Law Enforcement Training Center (FLETC), and the ATF at the National Academy in Brunswick, Georgia. At the ATF National Academy we trained in various investigative techniques to include preparing a proper search warrant. Since becoming a Special Agent with ATF, I have participated on numerous search and arrest warrants. I have a Bachelor of Arts Degree in Criminal Justice from The George Washington University and a

Master of Public Administration from the University of North Carolina at Charlotte. I also successfully completed a basic law enforcement academy with the Charlotte-Mecklenburg Police Department and served nearly eight years as a police officer.

3. During my tenure in law enforcement, I have conducted a number of investigations into violations of Title 18 and Title 21 crimes. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques: interviewing confidential sources and cooperating witnesses; conducting physical surveillance; conducting short and long term undercover operations; reverse undercover operations; controlled buys; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register data; requesting, collecting and analyzing billing records; and conducting court-authorized electronic surveillance. Further, I have participated in the preparation, presentation and execution of search and arrest warrants. Additionally, I have conducted and assisted in investigations and arrests leading to convictions for violations of federal laws, including firearms offenses, drug offenses, witness tampering, false statements and perjury, and obstruction of justice.

4. This affidavit is submitted in support of a search warrant for the office and work space of Michael LINTZ, Maintenance Supervisor, City of Norton Parks and Recreation Department, 1324 Water Plant Road, Norton, Virginia (Subject Premises).

## RELEVANT STATUTES

5. This investigation concerns alleged violations of 18 U.S.C. § 242 relating to the deprivation of rights under color of law. That section provides, in relevant part:

> Whoever, under color of any law, statute, ordinance, regulation or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges or immunities secured or protected by the

Constitution or laws of the United States . . . shall be fined under this title or imprisoned not more than one year, or both.

6. The particular federal right involved is substantive due process under the Fourteenth Amendment of the Constitution, which protects an individual's right to be free from sexual harassment, and coercive sexual assaults committed by a local government official acting under color of law.

7. This investigation also concerns alleged violations of 18 U.S.C. § 1001(a), which provides, in relevant part:

> Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative or judicial branch of the Government of the United States, knowingly and willfully –
>
> (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
>
> (2) makes any materially false, fictitious, or fraudulent statement or representation; or
>
> (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;
>
> shall be fined under this title, imprisoned not more than 5 years.

## FACTUAL BACKGROUND

8. Michael "Mike" LINTZ is the Parks and Recreation Department Maintenance Supervisor for the City of Norton, Virginia, which is located in the Western District of Virginia.

9. In the course of his responsibilities, LINTZ is tasked with supervising individuals assigned to perform community service by the Virginia Office of Probation and Parole for District 18, in connection with criminal penalties imposed in state cases. While other individuals

Page 3 of 17

work for the City of Norton Parks and Recreation Department (P&R), LINTZ frequently is the only city employee with the individuals assigned on community service.

10. Confidential Source 1 (CS1) stated she began probation in 2014, and began her community service at P&R in January 2015. She was referred to P&R by Kyle Redmond, a state probation officer with Probation and Parole for District 18. LINTZ was her supervisor, and he immediately began flirting with her and harassing her on the first day she reported to him. CS1 did not know LINTZ before this encounter.

11. In an early meeting with LINTZ about her supervision, LINTZ told CS1 that "the system was set up for her to fail," and that she would "need everyone she could get in her corner." He advised CS1 that she needed to work extra community service hours to account for the "interest on the fines" that the court would add to her sentence. CS1 later determined through the court that this statement was not true.

12. CS1 described LINTZ's behavior as very sexual, talking "nasty" to her about "sexual things" with other women, and trying to force her to touch him, for instance, by blocking a narrow doorway with his body to try to make her squeeze through by rubbing her body up against him. LINTZ would often say "scratch my back and I'll scratch yours," and offered to "build up [her] hours" and "help [her] out with the courts." LINTZ described "going to court" for other "girls" he supervised to "get them out of trouble." Based on the LINTZ's flirtatious language and demeanor, CS1 understood that he was requesting sexual favors in exchange for giving her credit for community service hours or testifying in court on her behalf.

13. On multiple occasions, LINTZ approached CS1 and began rubbing her shoulders, and offered to give her back massages. One time, when CS1 sat in the front passenger seat next to LINTZ while traveling for work, LINTZ placed his hand on her thigh and began rubbing it.

Page 4 of 17

14. At the time that CS1 was assigned to LINTZ, other female probationers were also assigned to community service with LINTZ. CS1 said she believes one of the other female probationers, Female Probationer 1 (FP1), was having a sexual relationship with LINTZ. On one occasion, LINTZ told CS1 and the other women present that he was going to engage in oral sex with FP1, saying "I'm eating [FP1's] pussy for lunch today." When LINTZ flirted with CS1, FP1 became confrontational with CS1, and threatened to physically assault her on multiple occasions.

15. After two weeks, CS1 decided she could not continue to work with LINTZ's harassment, and left after angrily telling LINTZ she could not stay there. CS1 tried to report her experience to Redmond at Probation and Parole for District 18, but Redmond told her she was a "liar" and that no one would believe her over Redmond. CS1 stated that she believes LINTZ did not credit her for all of the hours she worked because she rebuffed LINTZ's advances.

16. Confidential Source 2 (CS2) is presently on probation and began her community service at P&R in 2015. LINTZ is her supervisor. CS2 is a reliable and confidential informant for the Southwest (VA) Drug Task Force (SWDTF). She has been a confidential informant for two (2) years and over that time period was involved in twenty (20) cases; all resulted in the identification of criminal targets and successful prosecutions. CS2 consistently provided reliable information as corroborated by SWDTF agents.

17. When CS2 first started her community service at P&R, CS2 said two female probationers working at P&R at the time told her she could "suck off her hours." CS2 interpreted this statement to mean that LINTZ would accept oral sex in exchange for falsifying her hours.

18. During the time CS2 has worked at P&R, she noted that most of the probationers

referred to LINTZ's supervision were women; only one man served community service with LINTZ from August 2015 to February 2016.

19. During community service hours, LINTZ frequently brings CS2 and other female probationers back to his house to perform chores for him, such as washing his dishes, cleaning his home, washing his dog, etc. While at his house, LINTZ frequently offers alcohol to CS2 and other female probationers to drink while at his home. CS2 said she has seen LINTZ consume alcohol on at least 4 to 5 separate occasions at his home during the work day, and said he drinks Crown Royal.

20. On one occasion between August 2015 and October 2015, LINTZ brought CS2 and two other female probationers to his home during their community service hours to inventory his gun collection, so that LINTZ could submit the inventory to his personal homeowner's insurance carrier. During the inventory, LINTZ told CS2 and the two other women not to touch or inventory a certain group of firearms, because he did not want them to be recorded. Based on LINTZ's demeanor and remarks about those particular weapons, CS2 believed that those weapons may not be legally possessed by LINTZ.

21. CS2 believes LINTZ is having a sexual relationship with Female Probationer 2 (FP2), and has been present on multiple occasions when LINTZ and FP2 have left together for up to an hour at a time. FP2 has told CS2 that she has been having sex with LINTZ on those occasions. On one specific occasion, CS2 saw LINTZ and FP2 enter his bedroom, and she could hear the two of them having sex.

22. CS2 described the process of recording time for community service, with each probationer recording their own hours and LINTZ signing off with his approval. Timecards are kept in an area accessible to all who enter LINTZ's work area. CS2 has seen FP2's timecard,

and noted that FP2 recorded staying until 5pm. CS2 related that no one performs community service that late, and described LINTZ as leaving promptly at 4:30pm every day.

23. CS2 said FP2 has bragged about the amount of hours she gets in a two-week time period, as many as 196 hours in that time. CS2 described one special event, the Woodbooger Festival hosted by the City of Norton in October 2015, where she and FP2 worked additional hours. When CS2 saw FP2's timecard for that event, it reflected 10 to 12 hours of time worked. CS2 said that they each only worked three (3) hours for each day, for a total of six (6) hours.

24. CS2 said LINTZ bragged about getting FP2 out of jail, when he testified on her behalf during a detention hearing when she was arrested on federal charges. LINTZ testified about FP2's time during community service, and his relationship with her as her supervisor on community service. LINTZ told CS2 a normal timecard has 112 hours on it, but the timecard for FP2 had 136 hours on it.

25. CS2 described a different occasion with former Female Probationer 3 (FP3), who was previously performing community service at P&R. LINTZ took CS2 and FP3 back to his house, and LINTZ took FP3 into the basement of his home. CS2 heard what she believed was the sound of the two having sex; when FP3 came back upstairs, she told CS2 she had just had sex with LINTZ against the metal shelving in the basement.

26. On one occasion, LINTZ directed CS2 to falsify hours for another probationer, completing a timecard to show community service had been satisfied when in reality there were several weeks of additional time to serve. That probationer was the boyfriend of FP3.

27. According to CS2, LINTZ told her he has been having a sexual relationship with a married woman, former Female Probationer 4 (FP4), for seven years. LINTZ told CS2 he met FP4 when he was supervising her on community service at P&R. LINTZ told CS2 that he had

sex with FP4 in the P&R office, describing that he "bent her over that table right there." FP4 no longer performs community service at P&R.

28. LINTZ has directed sexual comments daily towards CS2, telling her that if any of the female probationers wanted to "start licking pussy" he would like to watch, has asked her to "show [him] [her] tits" 10 to 15 times, and makes comments about wanting to have sex with her. CS2 said she changed her dressing habits due to LINTZ's behavior, to dissuade him from approaching her sexually.

29. CS2 has observed LINTZ with two cell phones, one of which he uses primarily for watching pornography while at work. CS2 has seen LINTZ and FP2 watching pornography on his phone on several occasions while at work at P&R. LINTZ has asked CS2 repeatedly, at least three times per week, to watch pornography on his cell phone, saying things like, "come over here, look at this girl taking it up the ass."

30. CS2 advised that she was cleaning out LINTZ's desk at the P&R maintenance office and she found naked pictures in his bottom left desk drawer. CS2 recognized the pictures being of women she has known to have worked community service at P&R.

31. At the direction of government agents, CS2 made recordings of conversations she has had with LINTZ during her community service hours. On one recording, LINTZ asks CS2 to go to his house with him to fix his internet connection on his computer. When CS2 arrived, the internet connection was working fine, but LINTZ invited her to watch pornography with him on his television in the living room. He described his pornography collection, and the pornography he was displaying to CS2 in detail. LINTZ mentioned that he wanted to show the video to FP2.

32. Several minutes later, as CS2 returned from the bathroom, LINTZ told her she

can see his "nuts" anytime she "takes a notion." CS2 interpreted that to mean that he wanted to expose his genitals to her. A few minutes later, as they were leaving his house in the truck, LINTZ told CS2 that, if he were to have sex with her, he would need "all day" and described his sexual performance to her. He told CS2 that he likes to keep her around because she is "good looking."

33. Later that same day, on the recording, LINTZ received a call from FP4, who is upset that LINTZ brought CS2 to his house to fix the internet. LINTZ told CS2 they "should have just fucked and got it out of the way," since FP4 is already upset. CS2 reassured LINTZ that she had not told anyone about the time she spends at his house.

34. On January 30, 2016, LINTZ called CS2 to ask her to obtain prescription pills, Percocet, for him to get him through until he could renew his own prescription.

35. On February 6, 2016, CS2 stated LINTZ told her he would sign off on her having completed 100 hours of community service if she was able to fix his iPhone.

36. On February 11, 2016, on a recording made by CS2, Kyle Redmond, probation officer with Probation and Parole for District 18, arrived at the P&R to speak with LINTZ and check CS2's hours. Though Redmond does not supervise CS2, Redmond told LINTZ that CS2 needs to work 32 hours a week or go back to jail. As Redmond left he told LINTZ to call him if CS2 drops below 32 hours. CS2 said, to LINTZ, "I'm gonna have to suck them hours off ain't I?" LINTZ and another man working at P&R responded, "Yeah, it's gonna be tough on you. Man, that's bad girl. I don't know what you're gonna do." Two minutes later, CS2 said to LINTZ, "How many blowjobs will I owe ya?" LINTZ responded, "We'll try the first one out and see." LINTZ then hugged her, and told CS2 she needed to make sure she showed up for community service with LINTZ, because Redmond would be around to check to see that she was

Page 9 of 17
Case 2:16-mj-00005-PMS   Document 1   Filed 02/12/16   Page 10 of 18   Pageid#: 32

there.

## BACKGROUND ON COMPUTERS, DIGITAL MEDIA AND DOCUMENT STORAGE

37. Based on the information that LINTZ has produced photographs documenting sexual encounters with female probationers he has supervised, and based on the information that LINTZ has used pornographic videos contained on his phone while at work to initiate sexually explicit conversations with female probationers he has supervised, there is probable cause to believe that LINTZ possesses electronic media containing those images, described in more detail below.

38. Digital cameras save an image as a digital file that can be directly transferred to a computer by simply connecting the camera to the computer. Photos taken on a digital camera are stored on a removable memory card in the camera. These memory cards often store up to 4 gigabytes of data, which provides enough space to store over 1000 high-resolution photographs. Video camcorders, which once recorded video onto tapes or mini-CDs, now can save video footage in a digital format directly to a hard drive in the camera. The video files can be easily transferred from the camcorder to a computer.

39. The computer's ability to store images in digital form makes the computer itself an ideal repository for pornographic images like those described above. The size of the electronic storage media (commonly referred to as the hard drive) used in home computers has grown tremendously within the last several years. These drives can store thousands of images at very high resolution. In addition, there are numerous options available for the storage of computer or digital files. 1-Terabyte external and internal hard drives are not uncommon. Other media storage devices include CDs, DVDs, and "thumb," "jump," or "flash" drives, which are very small devices which are plugged into a port on the computer. It is extremely easy for an

individual to take a photo with a digital camera, upload that photo to a computer, and then copy it (or any other files on the computer) to any one of those media storage devices. (CDs and DVDs are unique in that special software must be used to save or "burn" files onto them.)

40. As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or ISP client software, among others). In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. Such information is often maintained indefinitely until overwritten by other data.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

41. Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

   a. Searching computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application or operating system that is being searched.

b. Searching computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises.

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

42. Based on my own experience and my consultation with other agents who have been involved in computer searches, searching computerized information for evidence or instrumentalities of a crime often requires the seizure of all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. There are several reasons that compel this conclusion:

a. The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the

system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

b. In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). In cases where the evidence consists partly of image files, the monitor and printer are also essential to show the nature and quality of the graphic images which the system could produce. Further, the analyst again needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

## **CONCLUSION**

43. Based on the information contained in this affidavit, probable cause exists to believe that Title 18 USC § 242, Deprivation of a Federal Right Under Color of Law, has been violated, and that property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located at the SUBJECT PREMISES, more fully described in Attachment A. I request authority to search and seize such material.

44. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

_____
Special Agent Ryan C. Temm

Page **13** of **17**

Case 2:16-mj-00005-PMS   Document 1   Filed 02/12/16   Page 14 of 18   Pageid#: 36

Bureau of Alcohol, Tobacco, Firearms and Explosives
United States Department of Justice


SWORN AND SUBSCRIBED TO BEFORE ME
THIS 12th DAY OF FEBRUARY, 2016

*Pamela Meade Sargent*
HONORABLE JUDGE PAMELA MEADE SARGENT
UNITED STATES DISTRICT COURT IN THE
WESTERN DISTRICT OF VIRGINIA

## ATTACHMENT A

### Description of property to be searched

1. The target location is Michael LINTZ's office and work space at the Norton Parks and Recreation Maintenance Division building located at 1324 Water Plant Road, Norton, VA.

2. See below photograph.



# ATTACHMENT B
## ITEMS TO BE SEARCHED FOR AND SEIZED

1. Instrumentalities of the aforementioned violations contained within the affidavit for the search warrant at City of Norton Parks & Recreation Department, 1324 Water Plant Road, Norton, Virginia, in any form wherever it may be stored or found including, but not limited to:

   a. any computer, computer system and related peripherals; tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, computer photographs, graphic interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such graphic interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to hardware, software, diskettes, backup tapes, CD-ROMS, DVD, flash memory devices, and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation, and any hardware/software manuals, used by, in the control of, or accessible to Michael LINTZ;

   b. mobile telephone devices, digital cameras, and portable memory devices used by, in the control of, or accessible to Michael LINTZ;

   c. any printing device used to print photographs used by, in the control of, or accessible to Michael LINTZ;

   d. originals, copies, and negatives of visual or written depictions of individuals engaged in sexually explicit conduct; and

   e. motion pictures, films, videos, and other recordings of visual or written depictions of individuals engaged in sexually explicit conduct;

2. Any and all documents, statements, reports, records, communications, and materials, both written and electronic, relating to the community service of any individuals referred by Probation & Parole District 18 to the City of Norton Parks and Recreation Department and/or to Michael Lintz.

3. Any and all statements, reports, records, communications, and materials, both written and electronic, relating to the reporting of hours of community service of any individuals referred by Probation & Parole District 18 to the City of Norton Parks and Recreation Department and/or to Michael Lintz.

4. Information or correspondence pertaining to personal affiliation with any female probationers referred to community service with City of Norton Parks and Recreation Department and/or with Michael Lintz.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.